MURNAGHAN, Circuit Judge,
concurring in part and dissenting in part:
The overburden on our federal judicial system is no little matter. Judge McMillan *207 faced an aggravated strain on the orderly functioning of his court as an aftermath of a tragic airplane crash. Eastern Airlines flight 212 on September 11, 1974 plummeted to earth near Charlotte, North Carolina, killing 69 passengers and 2 crew members. Nine passengers and 2 crew members survived.
The following lawsuits piled up in the United States District Court for the Western District of North Carolina, threatening a massive legal traffic jam:
1. The action of Richard Arnold IV for personal injuries;
2. The action of Francis C. Mihalek for personal injuries;
3. The action of Helen Rae Weston, as executrix, for the wrongful death of her husband, Lewis D. Weston;
4. The action by The Aetna Casualty Company and other insurers of Eastern Airlines under the Federal Tort Claims Act, 28 U.S.C. § 2674, against the United States, and under North Carolina common law against four air traffic controllers, claiming negligence which assertedly caused the crash.
The claims of the insurers sought indemnification or contribution for settlements made with more than 70 other victims of the crash or their next of kin.
In the Arnold and Mihalek cases, Eastern Airlines impleaded the United States, claiming that the air traffic controllers had negligently contributed to the accident. Eastern acknowledged its own liability for compensatory damages in all three accident cases but denied liability for punitive damages and put the three plaintiffs to their proof as to the amounts of compensatory damages.
Obviously, if each of the actions were separately tried, it would take months to dispose of all the litigation generated by a single incident. Some cooperation designed to relieve the situation took place. The parties did not contest the consolidation for trial of the Arnold, Mihalek and Weston cases.
Judge McMillan decided, however, that things-must go further in that direction. He, sua sponte, but over the objection of Eastern Airlines and of the insurance companies, ordered all the cases consolidated.
To try all the cases together admittedly presented problems of some substance. First the consolidation of the three accident cases with the claims of Aetna and the other Eastern insurers seeking indemnification or contribution necessarily meant a disclosure to the jury that Eastern Airlines was insured, and that insurance carriers, rather than Eastern Airlines itself, would bear all or a substantial portion of any award to Arnold, Mihalek or Weston. It is, of course, well established that such information should, to the greatest extent possible, be concealed from the jury. E.g., City of Cleveland v. Peter Kiewit Sons’ Co., 624 F.2d 749 (6th Cir. 1980); Langley v. Turner’s Express, Inc., 375 F.2d 296 (4th Cir. 1967); Fincher v. Rhyne, 266 N.C. 64, 145 S.E.2d 316 (1965). See Fed.R.Evid. 411. (“Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully.”).
Second, the insurance companies, to quantify their claims, would have to bring out just what they had paid in settlement to crash victims or their next of kin. Those awards totaled almost $22 million — an average recovery of over $314,000 — and could well influence the jury to apply some kind of victim fungibility rule (“If the loss of Jones injured his family to the extent of $314,000 certainly Smith’s — or Weston’s— family should be treated no less handsomely”). Of course, the peculiar and varying facts of each case should be determinative, with no attention paid to what some other unfortunate victim got.
I am ready to assume, for the purposes of this case that, despite difficulties which customarily would dictate separate trials, consolidation of all the cases was, nevertheless at least theoretically proper, in view of the great dislocations that otherwise were in store for the Western District of North Carolina. Fed.R.Civ.P. 42(a). But, by the same token, the very elimination of customary safeguards, regarded as necessary to insure fairness in the courts, imposed a *208 heightened need to insist on scrupulous fairness in all other aspects of the trial of the consolidated cases. Otherwise the Fed.R.Civ.P. 42(b) mandate to the district court that it conduct, if necessary, separate trials to avoid prejudice would be consigned to the dead letter heap.
Eastern Airlines was the one from whom customary safeguards, for reasons of overriding exigencies, were withdrawn. It did not, as the cases proceeded through trial, receive scrupulously fair treatment. Quite to the contrary, it was subjected to abusive and overreaching behavior recognized by Judge McMillan himself as excessive — beyond the normal leeway allowed counsel under the excitement and tension of a hotly contested trial.[1]
*209 If such abuses had taken place where each of the Arnold, Mihalek and Weston cases was separately tried, or where, while those three cases were consolidated the re *210 maining cases were not,[2] the existence of insurance and the knowledge of recoveries by other victims would not have been thrown into the jury’s pot. Probably then corrective action by the district judge with respect to abuses by counsel would have sufficed to insure the doing of justice. Whether instructions to disregard and scoldings of counsel are sufficient to counter the prejudice of improprieties by counsel is a matter which customarily falls within the scope of the trial judge’s discretion.
But here all the flexibility for accommodating to and neutralizing such prejudice had been exhausted at the outset by the imposition on Eastern Airlines of the not insubstantial weight of disclosure of insurance and of the amounts paid to others. Indeed, the counsel committing the improprieties even seized on the opportunities to enmesh, and thereby enlarge, the two areas of probable prejudice. Among the blatantly improper brayings were the following statements by counsel representing all three plaintiffs:
Finally, Richard Arnold. Evidence of the injury are again met with insults. The mind is a wonderful thing, suggests John Golding. After a while, you forget *211 the pain. Isnt that marvelous? Isn’t that a wonderful thing to come before you and say? If that were true, why should we compensate anybody under any conditions for the pain which they suffer? Let’s just wait a while. Let’s engage in a long lawsuit and drag our feet for five years and, by then, I guess we’re pretty well assured he would have forgotten all of the pain, every bit of it; and, as to the innuendoes about the motivation of the plaintiffs in this lawsuit and his reference, which I believe to be improper, to other lawsuits which were settled, some of which were settled — I might add— while the jury was out, let me say this to you. There has been no offer to settle Mrs. Weston’s case, as long as I have been the attorney for the case.
On objection by Eastern Airlines, the district judge admonished counsel to “stay off subjects which are forbidden for counsel to argue to juries whether they are true or false,” and instructed the jury that offers of settlement were irrelevant to the issues before it. He concluded with the statement:
You better obey. The next time there won’t be just a reprimand. This is not an idle suggestion Mr. Smiley. . .. Counsel are forbidden to discuss that subject any more in this case.
Yet subsequently, during closing argument, Mr. Diehl, attorney for one of the plaintiffs, stated:
He [Mr. Golding] represents with Mr. Rutherford [attorney for Aetna] the 19 insurance companies that have been busy buying off the claims of the other people and he’s finally run up against three human beings sitting right there and three lawyers that ain’t going to be bought.
Later, in a discussion between the court and counsel, out of the presence of the jury, about how to remedy the situation occasioned by those remarks, the court observed:
COURT: I should have smacked him about 500 bucks before he was allowed to argue another word to the jury, but I thought this was the quickest and simplest.
In sum, it seems that Judge McMillan was carried away with enthusiasm for the seeming reasonableness and efficiency of his consolidation plan. He was so committed to it that he could not bring himself to abandon it, even when outrageous excesses by counsel for the individual plaintiffs turned trial to travesty.
What appears to have happened is that counsel for the three plaintiffs and for the government, learning the district judge’s final determination that there was to be one trial and one trial only,[3] knew that they could safely practice gross abuses, in the certain knowledge that they ran no risk that the district court would employ that extreme, but ultimately efficacious, sanction, namely declaration of a mistrial. While whether to grant a mistrial lies within the trial judge’s discretion, it constitutes abuse of discretion to reveal, in advance, that practically no conceivable circumstances would lead him to invoke the remedy of mistrial. To do so predictably will cause the trial judge to lose control of the situation. That, I submit, is inescapably what happened here. To reread the egregiously unprofessional utterances (see my footnote 1 and the text of my dissent at 210-211) establishes, beyond peradventure, that such was the case.
In sum, the ease was one where prejudicial comments by counsel, in the totality of the circumstances, necessitated reversal and a new trial. City of Cleveland v. Peter Kiewit Sons’ Co., 624 F.2d 749, 758-59 (6th Cir. 1980).[4]
*212 In the majority’s opinion we observe an open invitation to outrageous misbehavior by trial lawyers. Each plaintiff’s lawyer may, from now on, be expected to ask: “What is a mere slap on the wrist, if, in exchange, I enhance my client’s recovery by hundreds of thousands of dollars? Others will come to me for representation on the basis of the size of the recovery, not on whether I behaved decently in court.” As politicians know, in like circumstances, the apt response is: “I don’t care what you say about me, as long as you spell my name correctly.”
Counsel now are insulated from any adverse consequences of utterly unprofessional conduct so long as they are careful to keep the invectives in the gutter. The majority places its imprimatur, its nihil obstat, upon “uninspired flights of invective.” At 199. The maintenance of proper courtroom standards has suffered a grievous blow from this day’s work. I pray for its recovery.
In light of all of the abuse heaped on Eastern Airlines, my conscience is shocked that it should be compelled to pay damage awards extracted from the jury through resort to such offensive tactics. Thus I would reverse, in the Arnold, Mihalek, and Weston actions, for a new trial limited to fixing the proper amounts of compensatory damages. Since the jury, even despite the prejudicial atmosphere of the trial, to Eastern Airline’s detriment, determined that no punitive awards would be proper, that portion of the judgment should not be disturbed. The improper, incurable prejudice all flowed in one direction.
Furthermore, as to the claims against the United States and the air traffic controllers, I perceive no sufficient prejudice respecting those quite different causes of action to necessitate a new trial. The claims against the United States had to be tried non-jury, and the air traffic controllers were fully relieved of liability by reason of the judgments entered on the claims against the United States, irrespective of how they came out, 28 U.S.C. § 2676. Judge McMillan was not exposed to the likelihood of prejudice in the way that the jurors may be expected to have been.
I concur with Judge Phillips in his conclusion that, for the reasons he has advanced, the Weston case must be remanded for retrial of the compensatory damages issue.
It is a source of regret to me that similar remands are not ordered in the Arnold and Mihalek cases. With hindsight we can clearly see that the consolidated cases should have been separated into two groups for purposes of trial. As they stand we are to end up having two trials anyway. Arnold and Mihalek should, with the Weston executrix, relitigate the amounts of compensatory damages they are entitled to and thereby receive fair and impartial judgments, not the ones flawed by prejudice which, by the majority’s decision, they will retain.

. Some examples of improprieties are set out here. Mr. Hemric, representing Richard Arnold, had this to say to the jury:
I’m asking, I’m begging for your sympathy for this man and for all the passengers on that plane.... They [the plaintiffs] are begging for your pity.
Mr. Diehl, also counsel for Richard Arnold, asked the jury to put itself in plaintiff’s shoes:
Let’s talk about compensation a minute. After much squabbling, we got in the photos of the airplane crash, the heat, the wreckage, the fire, the destruction, Richard Arnold— what a guy just out of an airplane looks like burned, burned over 47 percent of his body, third degree, second degree, first degree. We’ve had a little sunburn. I’m light-skinned. I don’t need to do anything but poke my head out and I get burned. Perhaps you’ve had similar experiences, and Solar-caine takes the pain away. Put a little squirt on and you’re okay. You imagine being fried in Eastern Airlines’ kerosene and how that feels.... He fought and kicked and got out of the plane. What difference does it make how he got out? It’s a miracle that he got out of the plane. They would rather him not have gotten out of the plane. It would be so much easier, but he got out of the plane, and he got out of the plane after being subjected to something that I can’t conceive, watching other people waving their hands as they burned to death.
He later argued:
I want to use the time I have left to, again, approach the theme of common sense and logic and tell you what I think is the most illogical thing of this trial. The most, the thing to me that makes the least common sense — and I have in my own mind dubbed it Eastern’s bad joke — I refer you to the cop-out defense of Eastern Airlines, the attitude that by coming into this courtroom and saying, we admit negligence. We’re sorry. We know our pilots crashed the plane. You caught us, caught us in a technicality. They misread an altimeter. We had two of our ace guys up there, ace pilots, and you caught us in this slight transgression and so, for that reason, give them some small amount of compensatory damages and, by the way, folks, there they are, the real culprits, murderers’ row over there, the guys that did it. We’re sorry, but what we really want to do is cop-out. We want to put the blame on somebody else. We want to sue the air traffic controllers individually for all the carnage and horror we caused. I think that defies logic and common sense. It made Scott Crossfield [witness for plaintiffs] sick. It makes me sick, and, members of the jury, I hope in the bottom of the pit of your stomach it makes you sick that these people would think that they can pull that in a court of law. It is outrageous. It is exemplified by what you saw. Frank McDer-mott, the man with the bionic ears, he hears things on cockpit voice recorder tapes that nobody else hears, and he comes here to tell you that he hears them to make you think that these pilots were busy flying the airplane, and he hears things on air traffic control tapes to make you think that these guys sat idly by and watched the bird crash and did nothing about it. It is to me the ultimate disgrace of failure to accept responsibility. It’s the kind of logic that brought you Leo Marshall. Wonder how long they had to look for a Mr. Marshall? He said he was hired October 24th. That’s over five years after this plane crash. They must have searched the countryside for somebody who had been in the air traffic control tower and who would come in and say, I read the reams of paper — it must be that high — and I find in those reams of paper a duty to watch airplanes all the way down, and I also find, based on what I’ve heard in this courtroom, that these guys breached that duty. Well, folks, for 40 bucks an hour, you can probably get almost anybody to say anything. I don’t think there was a bit of merit in anything he said. It’s irrelevant to my lawsuit, but it defies logic, and it tells you the attitude, the attitude, the attitude that’s still here. I think their strategy backfired. I think it destroyed in your minds the credibility of the great white knight corporation, Eastern Airlines; and if McDermott and Marshall didn’t destroy it, then the star witness of the trial, excuse me, I’m getting ready to say something bad about Frank Borman. Please forgive me. The star witness of the trial, Frank Borman, exemplified everything that I’m about in this case. From the moon ride to the TV ads and wherever you see him in the newspapers and magazines, he had the audacity and gall to *209 walk into this courtroom and to tell you the cockpit conversation had absolutely nothing to do with the crash of the plane. We didn’t call Frank Borman____ [T]hey needed the luminescence, the glow, John Golding’s new-found hero to come here and impress you.... That pompous, he’s been to the moon. Congratulations. I’ve been to Waxhaw, big deal. I’m not an astronaut. I’m not the President of Eastern Airlines, but his attitude made him the star witness of this case, folks. He is why they haven’t learned a lesson, he and Captain Brady---- Their conduct, Daniels and Reeves, what they did in that airplane is in wanton and reckless disregard of the rights and safety of the passengers of the airplane. I would be astounded if you don’t find that, and I think that’s all you need to find; but Borman and Brady, if you want to go back to where that kind of logic comes from, that’s where you go. You go right to the top of the airline. The buck stops there. Those guys in 1979 are condoning the very thing that killed 72 people five years ago. It’s gross negligence of the pilots and it’s gross negligence of this almighty corporation. It’s double gross negligence.... Captain Brady, the seed, just like you said, Howard, here comes the oak tree. He told you I was going to say it. He planted the seed of a misread altimeter. Well, I don’t think it was the seeds of a misread altimeter. I think what was going on there had been planted long ago. It was cockpit complacency. It was lack of discipline in the most gross, worst sort of way. It is exemplified in 1972 by flying into trees, taking off on the runway in Greensboro in the slush, hold onto your wing, honey, with the stewardess in the cockpit, killing people in the Everglades flying that plane into the ground, a year earlier in Charlotte whacking that 30-foot pole 3500 feet short of the runway, two special surveil-lances by the FAA, a road show. Did you see it? Where was the road show they bragged about? You didn’t see it and Jim Daniels didn’t see it, but they made money. They’re making money. In 1973 they lost 36 million dollars. In 1974, the year they burned these folks, they made 5.6 million dollars. Need a figure for punitive damages? That is their profit that year, 1974. Did they learn a lesson? No, they’re whacking them into the trees in Houston three months later, running off the runway in Buffalo three months later, and in June, 1975, they killed 112 human beings in New York. They learned a lesson. That’s the year they lost 50 million dollars, but they are still here, folks. They bounced back from a setback of an economic nature.... Well, I say this to you, it was no seed of a misread altimeter. By the time these guys got around to crashing 212, maiming those people, killing those people, it was an oak tree of indifference, and you ought to cut it down. You ought to crash it to the earth the same way they crashed 212 and, if that appeals to your emotions I hope it does. It’s time to stop it. They have not learned. They are here in ’79 with the same defense they had five years ago, a misread altimeter. What other aspects of the great oak — McDermott, Leo Marshall — a theory that the air traffic controllers should have been watching and waiting. They should have known Reeves and Daniels were turned loose on the rest of society that morning. It’s a mind-set that comes into this court and tells you that if other people crash airplanes it’s okay for us to crash airplanes. It’s got big, strong branches, this old oak that you need to take down, with witnesses in it like Sandy Sanderson, the pilot who flew the plane into the bay, National pilot. He flew the plane into the bay, and they brought him to say it’s okay to fly the plane into the bay. Maybe that’s why they wanted to acquire National Airlines, wanted to get Sandy on the payroll. Can you imagine getting in an airplane one morning, an Eastern jet, and they come on, welcome aboard Eastern Airlines, Captain Sanderson, Captain Daniels in the cockpit. Instead of passing out coffee, I assume they would roll down and hand out altimeters for the passengers. How sick would you be with that kind of logic? .... If you want to give them a message, you’re going to have to hit them in the pocketbook in a way they understand. Killing people and maiming people is something they have gotten immune to as a part of doing business.
Mr. Pangia, representing the government, stated:
Then they have the nerve to come in here — look at the caliber of the evidence— they come in here and put another pilot on the stand that says, yes, I went with my bus, speeding down the road, driving recklessly, and I crashed and I killed a couple of people. It happens all the time. Like a bank robber taking the stand and bringing in another bank robber and saying we rob banks all the time, it’s okay. I haven’t robbed a bank for three weeks now, I don’t think I should be punished. That’s the testimony you heard here. And the tragedy of this case, the tragedy of this case, ladies and gentlemen, is not just what happened here. This is not some recalcitrant teenager or some hoodlum out in the street that says it’s somebody else’s fault, or a lot of hoodlums go out and rob people or a lot of people drive recklessly. This is an attitude endorsed by a major corporation of coming in here and trying to pull a cop-out. It’s an attitude of a major corporation and when we tolerate that in this country, it’s the beginning of the end.
You know what this case here is all about? This case is all about a bus driver, taking passengers on in the bus, driving down the street, speeding and driving recklessly, and having a crash and killing and maiming peo- *210 pie, and then the bus driver goes to the police station and sues the policeman for not catching him on the radar trap. That’s what this case is all about. Then yesterday I hear Mr. Barwick come up here and talk about fairness, oh, be fair to us, that you should be fair, we shouldn’t be punished for our wrongdoings. 35 million, 960 thousand 8 hundred 68 dollars plus interest against each one of these individuals [the air traffic controllers], plus interest. They also sued for costs. They also want them to pay for costs of this whole shooting match. That’s what they sued them for. Fairness they talk about. Don’t hurt us, we’re just a little poor airline, with leverage of two million dollars and, .as the evidence showed, offered to buy National Airlines for 342 million dollars, and they say that is going broke. Treat us fairly, but sue them, get them for 35 million, nearly 36 million dollars each. I guess they figure they could borrow it.
And then they talk about the fairness, about the settlements that they have made, and that they are suing for their settlement in part they want from the air traffic controllers. They were dragged into a courtroom. The government was not involved in that case. Eastern was dragged into the courtroom and there was a case. They did not want to pay, those passengers had to sue them, and then they talk about fairness.
Now Mr. Barwick, when he came up here to argue, didn’t mention that Eastern as well as its insurers is looking to pass the buck to these air traffic controllers. He didn’t mention that. Maybe he’s ashamed of it, and rightfully he should be because it’s not fair to come up here and try to make you feel sorry for Eastern Airlines while doing what they’re trying to do to these people for doing their job. Yes, I’m angry. And then they couldn’t understand why the plaintiffs here, the people that were injured in this terrible accident, people that were hurt, lost loved ones in this terrible accident, why they have not sued the air traffic controllers. That was beyond their comprehension. Why, they haven’t come up with some kind of a reason. Well, maybe they’re honest.
Mr. Smiley, representing all three plaintiffs, argued:
We all heard those tapes long before the decision to file this lawsuit was made. The reason we did not sue the government is an extremely simple one. They aren’t liable, and we have a duty to this Court and our clients not to undertake to sue people or the government when there isn’t any liability. It’s a duty imposed upon us as officers of the court, and we believe it, and that’s why we didn’t do it, and we wouldn’t do it today.
And Mr. Pangia argued again:
I pray that you view this evidence, understand it sufficiently to do the right thing here. Mr. Rutherford, or the gang over here has an hour and a half after me. I will not have a chance to come back and refute. Those are the rules which we have laid out. So this is the last time I have to talk to you, and I just pray that you end this three year nightmare for these gentlemen [the air traffic controllers], Their reputation in the community, facing their families, you know what it’s like to go home with a lawsuit like that to live with for three years. They have been literally held as hostages for three years. Try to go to a bank and make a loan, try to buy a car and have to explain. . ..
COURT: I don’t believe we heard any evidence about that.
MR. PANGIA: End the nightmare, please.

. Consolidation for trial of the insurance company claims and the Eastern Airlines impleader would have been possible, without the threat, promptly followed by the actuality, of prejudice to one of the parties. That approach would have permitted the handling of all cases and claims in only two trials. The situation, it seems, developed into one where a good idea was pushed one step too far.

. On August 23, 1979, well before the commencement of trial, the district judge stated:
I intend to have only one more trial on all the fact issues in these cases. I intend to try them all in three weeks or less.
... I do not intend to have any separate trials later on the issues between the original defendants on the one hand and the air line controllers and the government on the other. That case will be disposed of in the same factual inquiry.

. Thoroughly analyzed in S. J. Peters, Improper Argument of Counsel: City of Cleveland v. *212 Peter Kiewit Sons’ Co., 12 Toledo L.Rev. 761 (1981).